5

(C.D. 4399)

THEO. H. DAVIES & CO., LTD. *v.* UNITED STATES

(Decided January 12, 1973)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiff.

*Harlington Wood, Jr.*, Assistant Attorney General (*Patrick D. Gill* and *Andrew P. Vance*, trial attorneys), for the defendant.

RAO, Judge: The merchandise involved in this case consists of crawler-mounted machinery manufactured by Bucyrus-Erie Co. of Canada, Ltd., entered at the port of Hilo, Hawaii, on April 9, 1969. It is described on the invoice as follows:

> Model 25–B Clamshell, comb. 60–10, Series III
> Unit LB–c: 40′ Boom, 8 part continuous suspension (1–5′ insert)
> Unit 13: Boom Stop

Unit 18 : Swing Brake
Unit 78(a) : Cat D–7 tractor type mtg. w/26″ single grouser treads
Unit 79 (B) : 850# Counterweight
Unit 56 : Signal Horn
Single Stick Clamshell Control
Knockdown Method "C"

The purchase order (exhibit 1) denominates the unit as Bucyrus-Erie 25–B (60–10) Series III Cane Loader.

The merchandise was assessed with duty at 8 per centum ad valorem under item 664.05, Tariff Schedules of the United States as modified, as excavating, levelling, boring and extracting machinery. Plaintiff claims it is entitled to entry free of duty under item 666.00, as amended, as harvesting machinery, chiefly used for agricultural purposes as a sugar-cane loader.

The pertinent provisions of the tariff schedules, as amended or modified, are as follows:

Schedule 6, Part 4:

Subpart B headnote:

    1. This subpart does not cover—

      *      *      *      *      *      *      *

    (ii) agricultural implements (see subpart C of this part).

664.05    Mechanical shovels, coal-cutters, excavators, scrapers, bulldozers, and other excavating, levelling, boring, and extracting machinery, all the foregoing, whether stationary or mobile, for earth, minerals, or ores; pile drivers; snow plows, not self-propelled; all the foregoing and parts thereof_____    8% ad val.[1]

Schedule 6, Part 4, Subpart C:

666.00    Machinery for soil preparation and cultivation, agricultural drills and planters, fertilizer spreaders, harvesting and threshing machinery, hay or grass mowers (except lawn mowers), farm wagons and carts, milking machines, on-farm equipment for the handling or drying of agricultural or horticultural products, and agricultural and horticultural implements not specially provided for, and parts of any of the foregoing_____    Free [2]

---

[1] as modified by Presidential Proclamation 3822, T.D. 68–9.
[2] as amended by Public Law 89–241, T.D. 56511.

General Headnotes and Rules of Interpretation:

10. <u>General Interpretative Rules.</u> For the purposes of these schedules—

\* \* \* \* \* \* \*

(e) In the absence of special language or context which otherwise requires—

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined;

At the trial plaintiff called Edwin Sorenson, assistant to the sales manager and used equipment manager of Pacific Machinery, a subsidiary of Theo. H. Davies & Co., the plaintiff herein. He had previously been general service manager for Theo. H. Davies, covering the Pacific area from Hawaii through the Samoas down to Guam and the Trust Territories. He had also held positions as used equipment and parts exchange manager and garage superintendent. Pacific Machinery sells all types of heavy equipment, such as tractors, excavators, and agricultural equipment. Mr. Sorenson had traveled throughout Hawaii, the Trust Territories, Guam and Samoa, and to mainland manufacturing plants and job sites. He had observed the use of cane loaders manufactured by Bucyrus-Erie and was familiar with the firm's industrial machines.

Mr. Sorenson testified that he has been familiar with the type of agricultural cane loader involved herein since 1957. Prior to that time the machinery used was not built to handle the steep hillsides on the islands. The imported merchandise consists primarily of two parts, the upper part being the so-called 25-B basic unit, and the lower part a D-7 crawler mounting with grouser bars. The basic unit consists of a revolving base, the complete hoist mechanism and engine, a complete cab with operator's controls, and a truck frame. To the basic unit there has to be added an undercarriage and a front-end attachment. The basic unit involved herein had 4-drum laggings on the hoist unit and a larger swing brake than is on the basic unit for industrial applications. The undercarriage was a D-7 Caterpillar crawler with grouser bars, that is, a heavy truck-type undercarriage that is used on a tractor or a bulldozer. After importation, a cane grabber was installed as well as lighting systems, larger fuel tanks, and an auxiliary engine to run the lighting system.

The combination, as imported, is designated by the manufacturer as combination 60-10. Mr. Sorenson called it an agricultural cane loader and said it was bought and sold by that name.

He testified that he had seen it used since 1957 on agricultural plantations for the harvesting of sugar cane. It moves up and down the windrows picking up cane and loading it onto trucks. Because it travels constantly, it has a much larger and heavier undercarriage than machines used for industrial purposes. The shoe or track has a grouser bar on it much wider than the standard flat shoe used on an industrial-type machine, because the cane loader is used on steep hillsides in the Hawaiian Islands. The cane loader also has a larger swing brake than that on industrial machines so the operator does not lose control on the steep hillsides. It has 4-drum laggers for speeding up lifting. It does not need the higher lifting capacity of industrial machines. According to Mr. Sorenson, industrial machines work off a flat area such as a roadway or in a flat floor area of a quarry and do not move while they are working, unless used to drag out a channel or canal. They would travel about 5 miles a year in contrast to the cane loader which travels 1½ miles per day during a 10-month period.

These features make the cane loader more expensive than industrial machines. In the experience of the witness, the cane loader is used only for harvesting sugar cane. He had sold such machines to plantation accounts and to all the sugar companies on the islands and had seen them used on agricultural plantations. He had never sold any to an industrial account. He had never seen them used or sold for anything but harvesting sugar. He said they would be unsuitable and expensive for other purposes. While he had never sold this merchandise on the mainland of the United States, he was of opinion that it would be extremely unuseful for applications there other than harvesting sugar because of the excessively long undercarriage, the grouser track shoes and the large lagging. These would not make the machine useful as a shovel, back hoe, or dragline. The undercarriage used with the 25–B basic unit to form the imported merchandise is not offered by Bucyrus-Erie for the model 25–B. It is a special feature from the larger 35–B that is put on the 25–B for agricultural use. The witness did not know whether that combination had been sold on the mainland.

He testified that different type equipment could be and is used with the basic 25–B unit, such as a clamshell bucket, a dragline, a crane. His firm sold industrial machines to contractors and quarries, including back hoes, lifting cranes, shovels with front-end working to the quarries, and a hydraulic version to contractors. However, the D–7 tractor-type mounting would not be suitable for industrial or construction purposes. The bases of the industrial machines depicted in exhibit A (a Bucyrus-Erie brochure), such as heel boom logger, dragline, hoe, shovel, crane, and clamshell, all have flat shoes. He had never sold a basic unit on a D–7 type of undercarriage for industrial use. It would

not be economical because this type of undercarriage is extremely expensive.

The B–25 is a one-yard machine, meaning that one yard is the capacity of the bucket used in industrial applications. The weight it could pick up depends upon the type of material. When used with a cane grabber, it can lift 4 to 6 tons. A clamshell bucket could pick up between 3,000 and 6,000 pounds.

Defendant called as its witness Kenneth Campbell, division manager and vice-president of Santa Fe Equipment Co., a dealer in heavy construction equipment, primarily cranes, and excavating equipment. It has offices in Hawaii, California, Georgia and Florida. It represents Link-Belt in Hawaii and California. The witness handled sales of Link-Belt products in San Francisco and in the states of Oregon, Washington, Nevada, and Arizona for 5 years and in Hawaii for 3 years. He is generally familiar with competitive lines of merchandise and had seen and examined the Bucyrus-Erie model 25–B, but he was not familiar with the cane loaders involved herein.

Mr. Campbell testified that the Link-Belt Speeder models LS–78 and LS–98 were similar to the Bucyrus-Erie model 25–B. They are all crawler-mounted cranes, rated with similar capacities—the LS–78 as a three-quarter yard machine, the LS–98 as a yard and a quarter, and the 25–B as a yard machine. They are similar in physical size and power capability. The LS–78 and the LS–98 can be equipped as a dragline, a hoe, a clamshell or a crane. They are designed for and the vast majority sold to the construction industry. They may be placed on a tractor undercarriage when the machine is going to do a great deal of traveling or go over hilly terrain. Then the additional cost of the tractor undercarriage would be a bargain because of the greater endurance of the machine. Purchasers of such machines include others than agricultural users, such as the pipeline industry and dragline users who maintain extensive canals. These applications involve walking operations.

Through his work with parts and services for machines sold by a predecessor company, the witness knew of sales of the basic model LS–78 or LS–98 with a standard undercarriage to sugar plantations. He had seen one such machine in operation at McBride Sugar. He knew of another that was sold to a sugar plantation and then resold into the construction field. The tractor undercarriages used with the LS–78 and LS–98 were International Hi-Walkers and not D–7 Caterpillars. The witness had never seen the D–7 undercarriage.

In rebuttal, Mr. Sorenson testified that he knew of the International Hi-Walker, which has a track with grouser bars, but does not have as long a roller frame and is not used on the Bucyrus-Erie cane loader. Another firm, however, P. & H. Harnesger, did use it at one

time on other than a Bucyrus-Erie cane loader. The D–7 has a larger frame and heavier components. The Hi-Walker has extra ground clearance and is used in pipeline operations and crane operations in the hills where pipe is being laid. According to Mr. Sorenson, a back-hoe-type machine is used in the pipeline industry. A D–7 type undercarriage could not be used because the frame is too long. A back hoe has a long cambered boom which scoops dirt toward the machine. If the track frame is long, the back hoe will be constantly pulling into the machine where the tracks are located. A shorter frame is needed, such as is used on the Hi-Walker. That machine would do a better job as a dragline also because the dragline bucket is pulled up close to the machine. If the D–7 were used, there might be interference between the fair lead line and the long track frame as the machine swung. The D–7 is far more expensive.

In order for the merchandise involved herein to be classified under item 666.00, *supra*, as claimed by plaintiff, it must belong to a class or kind of article chiefly used for agricultural purposes at or immediately prior to the date of importation. General Interpretative Rule 10(e)(i), *supra*. The first question then is whether the class or kind to which this merchandise belongs comprises machinery having the cane-loader configuration, that is, a 25–B basic unit and a D–7 tractor undercarriage, or whether it includes other machines having a 25–B basic unit mounted on a crawler.

The evidence shows that the 25–B basic unit or the somewhat similar LS–78 and LS–98 units become components of various machines having various uses, most of them industrial.

The D–7 undercarriage, the Hi-Walker undercarriage, and the standard (flat shoe) undercarriage also become components of various machines using the 25–B or similar basic unit.

Other components consist of equipment such as a clamshell bucket, hoe, shovel, dragline, crane, or cane grabber.

The imported merchandise is a particular combination or configuration consisting of a 25–B basic unit having 4-drum laggers and a larger swing brake, and a D–7 tractor undercarriage. It was used, after importation, with a cane grabber. There is no evidence that it was ever equipped with a clamshell or other type bucket or a crane.

While the record indicates that the 25–B unit *per se* could be used with a clamshell bucket, shovel, hoe, or crane, and that it could be mounted on a standard or a tractor undercarriage, there is no evidence that these components are readily interchangeable, once they have been combined. Mr. Sorenson testified that it would be possible to lift the basic 25–B unit off the tractor undercarriage and set it on a standard undercarriage but that it had not been done because it would be extremely costly.

The cane-loader configuration (the 60–10 combination) and other configurations, such as the clamshell, dragline, hoe, shovel, or crane, have two characteristics in common—they have as one component a 25–B or similar basic unit and they are crawler-mounted. Otherwise, the combinations differ in kinds of undercarriage and working equipment and are used for different purposes. For some uses, the D–7 undercarriage would not be practicable or economical. Conversely, the standard undercarriage is less useful for harvesting sugar in steep hilly terrain.

The tariff schedules do not regard all of these combinations as within the same class or kind. Shovels and excavating machinery, for instance, are provided for in item 664.05, whereas cranes and lifting machinery are covered by item 664.10 and mobile cranes by item 692.16.

The situation here is analogous to that involved in recent shoe machinery cases where the question was whether the imported merchandise belonged to a broad class, such as slush molding or injection molding machines, or a narrower class comprising a particular kind of slush molding or injection molding machine, chiefly used as shoe machinery. *E. Dillingham, Inc.* v. *United States*, 65 Cust. Ct. 224, C.D. 4082 (1970) ; *Converse Rubber Company* v. *United States*, 65 Cust. Ct. 453, C.D. 4121 (1970), *decision on rehearing* 69 Cust. Ct. 55, C.D. 4374 (1972).

In the *Dillingham* case the issue was whether molds for use with a particular slush molding machine were parts of a class or kind of machinery chiefly used for producing shoes. The court held that to establish that the Bata monoplax unit (the machine with which the molds were used) belonged to a class of merchandise chiefly used as shoe machinery, it would have to be shown that there was a kind of slush molding machinery which was chiefly used as shoe machinery and that the Bata monoplax unit belonged to that class. Since such evidence was lacking, the protest was overruled.

The *Converse Rubber* case involved injection molding machinery claimed to be shoe machinery. At the first trial the court found from the evidence produced then that the imported Desma machine was an injection molding machine and was a general purpose machine, although used only to produce soles for sneakers. Upon rehearing, additional evidence was presented showing the various classes and kinds of injection molding machines and their uses. The court held:

> The amplified record in our opinion does change the factual situation as originally presented. While defendant's exhibit A depicts various uses [for the Desma machine] other than shoes, the present record establishes that by virtue of the small size of the platen, the production for all practical purposes of these items is economically unfeasible except for the manufacture of soles for shoes. The question of economics appears to be a determining fac-

tor as to which type of molding machine will be used in a particular industry. Accordingly, we feel the multiple station rotary press is a class or kind unto itself. The use or operation of a rotary machine is not any more similar to the horizontal, vertical or shuttle type press than is a motorcycle to an automobile. While the Desma machine belongs to the broad class of injection molding machines, it is not a general purpose machine, according to the record, but it is a specialized machine particularly adapted for and used in the manufacture of shoes. *United States* v. *Hudson Shipping Co., Inc., et al.*, 49 CCPA 92, 96, C.A.D. 802 (1962).

While there may be a broad class of crawler-mounted machines having a 25–B or similar basic unit, such machines have different components and different uses depending upon those components. The 60–10 combination or cane-loader configuration is not a general purpose machine, but was designed for and is used only with a cane grabber for harvesting sugar. There is no evidence that it ever was in fact used for anything else. For the purpose of determining chief use, it is in a class by itself rather than in a broad class of crawler-mounted machinery having different components and uses.

The Government claims, however, that even if the cane loader is a special purpose machine, plaintiff has failed to establish its chief use throughout the United States.

Chief use is a question of actual fact and must ordinarily be established on the basis of positive testimony representative of an adequate geographical cross section of the country. *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, 164, C.A.D. 544 (1953) ; *Western Stamping Corporation* v. *United States* (*Louis Marx & Co., Inc., Party in Interest*), 57 CCPA 6, C.A.D. 968, 417 F.2d 316 (1969) ; *W. A. Gleeson* v. *United States*, 58 CCPA 17, 22, C.A.D. 998, 432 F.2d 1403 (1970). Evidence of chief use in one state or part of the country, standing alone, will not suffice, unless it appears from the evidence and the character of the merchandise that the article would be used in substantially the same manner by the same class of people in one section of the country as in another. *Pacific Guano & Fertilizer Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 218, T.D. 42240 (1927) ; *United States* v. *Spreckels Creameries, Inc.*, 17 CCPA 400, T.D. 43835 (1930) ; *United States* v. *F. W. Woolworth Co.*, 23 CCPA 98, T.D. 47765 (1935) ; *A. N. Deringer, Inc.* v. *United States*, 48 Cust. Ct. 138, C.D. 2326 (1962).

According to the record in this case, the 60–10 combination was designed for use in picking up and loading cane on the steep hillsides of Hawaii. The tractor-type undercarriage, the larger swing brake, and the 4-drum lagging served this particular purpose. Although the witness Sorenson had not made any sales of this merchandise on the mainland of the United States, he stated that the 60–10 combination would not be used there for any purpose other than loading cane be-

cause of its design which made it unuseful and unsuitable for other applications and because of its additional expense. The witness Campbell had never seen a machine with the cane-loader configuration even though he sold industrial equipment in California, Oregon, Washington, Nevada, and Arizona. The machines with tractor undercarriages which he had seen had the Hi-Walker undercarriage which was shorter and higher and was suitable for pipeline operations.

In *Catton, Neill & Co. (Ltd.)* v. *United States*, 11 Ct. Cust. Appls. 278, T.D. 39084 (1922), the merchandise consisted of centrifugal machines imported at Honolulu for use in the manufacture of sugar on Hawaiian plantations. The question was whether the machines were chiefly used in the manufacture of sugar. Plaintiff called one witness who had had charge of sugar plantations and refineries in Hawaii and was president of a firm which had large machine shops there, manufactured sugar machinery, and acted as agents for other manufacturers. The witness testified that he had ordered the machinery involved according to specification for use in the manufacture of sugar, that it was used as such, and was particularly adapted to that use, and that in the Hawaiian Islands it was used for no other purpose. The witness had no knowledge of any other use to which it might be adapted. The court held the evidence sufficient to establish chief use, stating (p. 280):

> * * * It is fair to believe that the witness was a business man of considerable experience with such machinery, and if there existed an equal or major use thereof other than in sugar making it is probable that he would have known of that fact. His lack of knowledge of such another use was therefore probative to the effect that there was no other such use. * * *

In the instant case, Mr. Sorenson was engaged in the business of selling tractors and all types of industrial and agricultural machinery. He was in a position to know the uses to which his merchandise might be put. He was aware of the various combinations which had the basic 25-B as a component and knew of their uses, but he stated that the design of the 60-10 combination with its added expense over industrial machines made it impractical and too expensive for use for other purposes than in loading cane.

There is no evidence that it was in fact used for any other purpose. The brochures illustrating the various uses for the 25-B and similar basic units do not depict any combination like the cane loader, an indication that it was not a general purpose machine which would appeal to industrial users. Mr. Campbell testified that his firm has separate brochures for machines with the Hi-Walker tractor undercarriage, but these were not produced at the trial.

I conclude that while the evidence of use is limited to Hawaii and the Pacific Islands, the record establishes that there is no other actual

or practicable use and that, in view of the nature, character and special design of the 60–10 combination, its use would be the same throughout the country. *Border Brokerage Company, Inc.* v. *United States*, 65 Cust. Ct. 277, C.D. 4089, 343 F. Supp. 1396 (1970), *aff'd sub nom. United States* v. *Border Brokerage Company, Inc.*, 59 CCPA 151, C.A.D. 1058 (1972) ; *Border Brokerage Co., Inc.* v. *United States*, 64 Cust. Ct. 458, C.D. 4020 (1970).

Since the use of the imported machine is for harvesting sugar cane, the claim that it is properly classifiable under item 666.00, Tariff Schedules of the United States, *supra*, is sustained. Judgment will be rendered accordingly.