HAWAIIAN MOTOR COMPANY

v.

UNITED STATES.

C.D. 4790.

United States Customs Court.

March 8, 1979.

Stein, Shostak, Shostak & O'Hara, Inc., Los Angeles, Cal. (John N. Politis, Los Angeles, Cal., of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., (John J. Mahon, Trial Atty., New York City), for defendant.

RICHARDSON, Judge:

The merchandise in this action, described on commercial invoices as "Xenoah" BCD Brush Cutters, was exported from Japan in 1975, and classified in liquidation upon entry at Los Angeles, California, under TSUS item 674.70 as modified by T.D. 68–9 as hand-directed or -controlled tools with pneumatic or self-contained non-electric motor, and parts thereof, other, at the duty rate of 4.5 per centum ad valorem. The plaintiff-importer claims that the merchandise is properly classifiable under TSUS item 666.00 as hay or grass mowers (except lawn mowers) or as agricultural and horticultural implements, not specially provided for, and parts thereof, free of duty. And the Government claims, alternatively, that in the event the court overrules the classification of the imported merchandise, then the merchandise is properly classifiable under TSUS item 666.10 as modified by T.D. 68.9 as lawn mowers, at the duty rate of 10 per centum ad valorem.

In the complaint plaintiff alleges that the merchandise in issue was chiefly used in the United States at the time of importation to cut hay, brush, weeds and foliage in agricultural and horticultural pursuits. Although this allegation is put in issue by the Government's answer, it is noted that there is no allegation in the complaint concerning the chief use of any class or kind of article to which the imported article is alleged to belong.

As imported the merchandise consists of a 22.5 cc gasoline engine, stand, tool kit, and two blades packed in one carton, and a drive shaft packed separately in another carton. However, the record shows that the merchandise is not marketed in this country in the condition in which it is imported. As sold here the product, referred to by plaintiff as the "Green Machine 3000", consists of some of the imported merchandise plus a nylon cord trimmer, and, in some cases, a hedge trimmer, and/or a two-speed drill. The nylon cord trimmer is used in place of the imported brush and saw blades which are usually sold here only as accessories. And when either the hedge trimmer or two-speed drill is to be used, the engine is detached from the shaft and coupled to the trimmer or drill.

Most of the rather extensive testimony given by witnesses called on plaintiff's behalf on the issue of chief use is directed to the use of the article with components added in the United States, principally the nylon cord trimmer. However, since such evidence reflects a condition of the merchandise other than as imported, this evidence is irrelevant on the issue of chief use, and cannot properly be considered by the court in connection with classification of the imported merchandise. It is well settled that classification of an imported article must rest upon its condition as imported. Carrington Co. et al. v. United States, 497 F.2d 902, 61 CCPA 77, 81, C.A.D. 1126 (1974); United States v. Citroen, 223 U.S. 407, 414–415, 32 S.Ct. 259, 56 L.Ed. 486 (1912).

In reaching this conclusion the court is not unmindful of the case of Theo. H. Davies & Co., Ltd. v. United States, 70 Cust.Ct. 5, C.D. 4399 (1973), to which attention has been called by plaintiff. In that case a cane grabber was added after importation to the imported cane loader adjudged by the court to be in a class by itself, and the presence of the cane grabber was considered by the court in reaching its conclusion of chief use as an agricultural implement entitled to classification under TSUS item 666.00 as claimed by the importer.

It is clear, however, that the facts in C.D. 4399 are significantly different from those at bar. In C.D. 4399 the cane loader was used only for harvesting sugarcane, and the added cane grabber was obviously comple-

*mentary* to this singular use. In the instant case, the components added in the United States are not *complementary* to the use of the imported blades, but are *substitutes* therefor, and involve different uses. As such, C.D. 4399 does not pose a deterrent to the court's rejection here of the evidence offered by plaintiff embracing post-importation components. The court fully agrees with defendant's contention that "any arguments, evidence or exhibits that rely upon the use of the imported article with other than the imported saw or brush blade are completely without relevance or merit, and cannot be a proper basis for the classification of the merchandise before this Court." * (Defendant's brief, p. 19)

With respect to the blade-equipped imported article, Dale Duane Evenson, plaintiff's president, testified that with the brush blade one can cut heavy, stalky brush and clear brush with it, and that with the saw blade one can clear out heavy brush as well as trim branches off trees and other plant-type things. The witness pointed out that the Xenoah BCD Brush Cutter has an all-position diaphragm carburetor which enables one to turn the cutter up and reach overhead in connection with work in trees and on hillsides. Mr. Evenson stated that he did not know how plaintiff's sales of the imported brush cutter compared with sales of competitors in 1974 and 1975 who numbered about three or four.

A promotional film sold by plaintiff through its distributors to dealers depicts, among other things, the use of the Green Machine 3000 equipped with a blade in an overhead posture (exhibit 2). Another promotional film (exhibit 3) depicts, among other things, the Green Machine 4000 equipped with a blade being used in an upright position. It is said that the model 4000 machine, being a heavy-duty machine with a larger motor and more power than the model 3000 machine, lacks the all-position diaphragm carburetor which would en-

able it to be used in an overhead posture as is done with the model 3000 machine.

There is little evidence in the record as to how blade-equipped brush cutters were used in the United States as of the time of importation of the Xenoah BCD Brush Cutters at bar. Of the six witnesses presented by plaintiff none testified to any significant extent relative to blade-equipped cutting machines.

Joel F. Herman, grounds maintenance contractor for Maintenance Engineers of Los Angeles, California, testified that his company didn't use the blades on its Green Machines.

Carl J. Cole, a lawn mower equipment sales and service store owner based in Wichita, Kansas, testified that only 20 percent of the Green Machines he sold were equipped with blades.

Wilbur L. Johnson, head of Johnson Agricultural Corporation, an orchard management and development business in San Diego, California, testified that he *thought* the majority of the 35 model 3000 Green Machines he sold from late 1975 until late 1977 were equipped with blades.

Bryant Cleve Larson, president of Oregon Toro Distributors, a specialty wholesaler of lawn and garden products in the southwest river counties in the state of Washington, testified about sales of Green Machines and observed uses thereof in Oregon and Washington only in *1976 and later.*

Gordon Paul Davis, general manager of Pacific Turf of San Diego, California, which is in the business of commercial sales and distribution of turf equipment, testified that he has seen the Green Machine 3000 used, among other things, for pruning trees in the San Diego county area.

Thus, only the witness Davis offered any relevant testimony relating to the use of the imported brush cutter during the period in question. However, plaintiff presented no evidence as to the chief use of a *class or kind* of merchandise to which the imported merchandise belongs. And, unlike the situ-

---

* With the rejection of evidence of post-importation components for irrelevancy, the court also does not reach defendant's alternative claim for classification of the imported brush cutters un-

der item 666.10 as lawn mowers inasmuch as this claim is predicated upon the rejected evidence (defendant's brief, p. 37).

ation in C.D. 4399, the instant record indicates that three other blade-equipped cutting machines were produced or offered for sale in this country during the period in question which competed with the imported article.

█ Classification of articles under item 666.00 is controlled by use. And the use which governs is the chief use of the *class or kind* of articles at or immediately prior to importation to which the importation belongs. *General Interpretative Rule 10(e)(i).* See also, *United States v. Baltimore & Ohio R. R. Co., a/c United China & Glass Company,* 47 CCPA 1, C.A.D. 719 (1959).

█ Further, chief use must be predicated upon evidence which is representative of an adequate cross section of the country. *L. Tobert Co., Inc., et al. v. United States,* 41 CCPA 161, 164, C.A.D. 544 (1953).

█ Measured against these principles it is clear that plaintiff's evidence falls well short of establishing the chief use of the *class or kind* of merchandise to which the imported merchandise belongs as hay or grass mowers, or as agricultural and horticultural implements, not specially provided for, within the meaning of item 666.00.

There is no indication of record that the merchandise as imported was equipped with a blade guard for use in connection with the operation of the two circular blades, and two witnesses gave the absence of a blade guard as a reason for not using the machine. The witness Herman testified on cross-examination by defendant's counsel (R.57):

Q. Would you sue the blades in that more than you would the monofilament head?—A. We use, basically, the monofilament for a safety standard. We have had very poor luck keeping the safeguards. Our men sort of discharge them, and my insurance company frowns on them, so we stay strictly with the monofilament yarn.

In the same connection, Arnold J. Reah, general manager of Piston Powered Products, a manufacturer of gasoline powered two-cycle engines and accessory tools, testified on cross-examination by plaintiff's counsel (R.315):

Q. In your experience with the farm, would you say the Green Machine 3000 would be a handy tool to trim the branches of orchards on the farm?—A. We did not have orchards, so to speak, on our particular farm. As far as myself, I have to go along with my feeling before that I think it is quite dangerous.

Q. Have you ever used the Green Machine to cut overhead?—A. No.

Q. Have you ever done it?—A. No, I have not.

Q. You don't know whether it is safe or not?—A. I see a blade rolling around and I don't want to use it.

On his direct examination the witness Reah testified that his company contemplated producing a cutting machine equipped with a blade at one time, but decided not to do so after evaluating the amount of sales of the blade and the safety hazard (R.305).

The court, while viewing the demonstration film of the Green Machine 3000, observed the unshielded cutting blades, and an exposed blade revolving at 5000 rpm or more represents a potential source of danger to the machine operator and others should the blade separate from the power shaft for any reason while the machine is being manipulated overhead, or even along the ground. As such, the court is not inclined to presume from an inspection or other examination of the imported merchandise that a *class or kind* of merchandise to which the imported merchandise belongs is being used in this country in the manner contended for by plaintiff.

But even if the court could conclude, as plaintiff suggests (plaintiff's brief, p. 30) that "the character of the Green Machine demonstrates its chief use as a horticultural implement", the court fails to see how this would aid the plaintiff in this case. The very versatility of the Xenoah BCD model, i. e., ability to prune overhead as well as to cut in a sweeping arc at ground level, demonstrates that this particular model is something "other than" or "more than" a *grass*

*mower* for purposes of classification under the *eo nomine* provision therefor in item 666.00, and as such, could not properly be classified thereunder. Moreover, the Xenoah BCD model does not appear to be the model intended by the foreign manufacturer to be used for grass or pasture mowing, according to literature attached by plaintiff to its administrative protests filed in the case, depicting another model equipped with knifelike rotary blades under a disk cover for ground level operation.

█ And, as for classification of the Xenoah BCD model under the residual provision in item 666.00 for *horticultural implements not specially provided for*, such action would only be warranted if the cutting machine were not specially provided for in the TSUS. See *Headnote 1, Schedule 6, Part 4C, TSUS*. However, the court is firmly of the opinion that the Xenoah BCD Brush Cutter is described by and falls squarely within the provision for hand-directed or -controlled tools with self-contained non-electric motor in item 674.70, and is, therefore, specially provided for in the TSUS. The machine is hand operated, and, when fully assembled, contains a self-contained non-electric motor. The court is not persuaded that the designation "motor" in item 674.70 is to be given a meaning other than or more restrictive than its common meaning which, of course, embraces the term "engine". And, in the court's view, an article which is described in a tariff provision in terms of its functions, properties, or attributes, or any combination thereof, as is the case with item 674.70, is as much "specially provided for" as is an article which is described in a tariff provision in terms of its name.

It follows, therefore, that since plaintiff has failed to establish *prima facie* the chief use of the imported brush cutters the action must be dismissed.

Judgment will be entered herein accordingly.