(C.D. 4828)

AMERICAN POWERAIL, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 77-2-00188

(Decided November 28, 1979)

*Dabney, Garwood & Holland* (*David C. Holland* at the trial and on the brief) for the plaintiff.

*Alice Daniel*, Acting Assistant Attorney General; *Joseph I. Liebman*, Attorney in Charge, Field Office for Customs Litigation (*Madeline B. Kuflik* at the trial and on the brief), for the defendant.

RICHARDSON, Judge: The merchandise at bar, described as accessories for Powerails, was exported from West Germany in December 1975, and classified in liquidation upon entry at Houston, Tex., under the provision in TSUS item 685.90 as modified by TD.. 68–9 for "other electrical apparatus for making or breaking electrical circuits, for the protection of electrical circuits, or for making connections to or in electrical circuits" at the duty rate of 8.5 *per centum ad valorem*. Plaintiff claims that the merchandise should be classified under the provision for parts of cranes in TSUS item 664.10 as modified by T.D. 68–9 at the duty rate of 5 *per centum ad valorem*.

The individual articles comprising the importation, as reflected on the invoice, consist of Powerail, end feed, line feed, end cap, sliding hanger, suspension bolt, collector, towing arm, and connecting pin. Erich Schneider, plaintiff's executive vice president who is in charge of buying, importing, marketing, and shipping of the product, and the sole witness in the case, described the importation as being a system "which supports a movable trolley which brings the current from an outside source from a terminal box to the crane, to the movable part of the crane. It therefore makes it movable." (R. 13) The witness stated that the imported product is "insulated and also completely enclosed." (R. 17)

The record shows that the Powerail is a polyvinyl chloride boxlike housing in lengths of approximately 6 to 12 feet which supports a maximum of five copper rails or conductors internally embedded in its sides and top to which electricity is introduced by means of an end feed or a line feed, as the case may be, connected to a stationary power source. The electrical current is transferred from the conductors to an internally mounted and movable collector trolley in constant contact with the conductors by means of spring-loaded brushes positioned in the trolley body. And from the trolley the current passes to an electrically powered overhead crane motor by means of a cable connection suspended at the Powerail from an arm of the sliding or rolling trolley which protrudes from a small aperture along the entire base of the Powerail. The Powerail is mounted in juxtaposition to the crane beam although not supported by the crane beam itself.

The record further shows that of 1 million linear feet of Powerail sold by plaintiff in the United States, approximately 1,800 linear footage, or less than 0.2 percent, has been used in applications other than overhead cranes. However, descriptive literature authored by plaintiff (exhibit A) and distributed to its customers and potential customers, indicates that the Powerail can also be used for safe, mobile, power feeding of hoists, monorail systems, electric power tools, textile

machines, machine tools, production lines, studio and station lighting systems, and many other applications. Moreover, the witness Schneider testified that there are other manufacturers in the United States of electrical systems that can be used for the same purposes as the Powerail, and that the plaintiff does not import or manufacture cranes.

At the conclusion of the trial, defendant moved to dismiss the action for failure on the part of plaintiff to establish a *prima facie* case. Decision was reserved by the court on the motion. And briefs were subsequently filed by the parties.

In its brief plaintiff argues that the Powerail is not includable under item 685.90 because, under the doctrine of *ejusdem generis*, the Powerail is not sufficiently similar to the articles specifically described in the provision to be included as apparatus for making or breaking electrical circuits. Plaintiff further argues that the chief use of the Powerail is as "part" of overhead cranes.

Defendant argues in its brief that the imported merchandise is specifically provided for in item 685.90. Defendant further argues that plaintiff has failed to establish that articles *of the same class or kind* as the imported merchandise were used as *parts* of cranes in the United States at or immediately prior to the date of importation.

Although the case was tried and briefed on the theory that the imported merchandise constitutes an electrical system, it is clear from the invoice before the court that the merchandise was imported as individual articles and not as a system *per se* (there is no question but that the ultimate use of the imported articles is in an electrical system). Inasmuch as imported merchandise must be classified in the condition in which it is imported, and not in a condition which reflects subsequent usage, *The American Import Co.* v. *United States*, 26 Cust. Ct. 361, Abs. 55248 (1951), it is apparent to the court that a number of the individual articles before the court were inappropriately grouped as part of an electrical system for classification purposes under circumstances which required preservation of their individuality for such purposes. See and compare *J. E. Bernard & Co., Inc.* v. *United States*, 59 Cust. Ct. 31, 36, C.D. 3060 (1967), treating a "valve clip used for retaining the tube in the receptacle" as a *support* article rather than as an electrical device.

Such is the case with respect to the nonelectric items of the importation, i.e., sliding hangers (referred to by the witness Schneider as steel stiffener clamps (TSUS item 657.20), suspension bolts (TSUS item 646.54) and towing arms (TSUS item 657.20), all of which are shown in exhibit 2 or in exhibit A. The same is true with respect to the nonelectric end caps of polyvinyl chloride composition, more appropriately classifiable, it would appear, as electric insulators of plastic under TSUS item 773.30. Item 685.90, under which these nonelectric articles were classified, does not address itself to electrical systems as

such. The provision covers specific electrical devices and components and parts thereof which are identified either by *eo nomine* designation or in terms of electrical function.

The remaining articles of the importation, namely, end feed, line feed, Powerail, copper connecting pins, and collectors, would appear to the court to readily respond to the tariff language "electrical apparatus for making * * * connections to or in electrical circuits" in item 685.90, except that, in the case of *insulated conductors*, such as the evidence shows the Powerail itself to be, Congress has shown a predilection for providing separately therefor under either TSUS item 688.04 or TSUS item 688.06, depending upon the weight of the copper content. In this respect, Congress seems to have elected to follow the format of the Brussels Nomenclature. See "Explanatory Notes to the Brussels Nomenclature (1955)," volume III, heading 85.19, page 961, heading 85.23, pages 968–969.

Although the court's view of the nature of the importations at bar tends to place it at odds with the resulting classification of the merchandise, at least in some respects, the view the court takes of the case makes it unnecessary for the court to resolve the case on the basis of the classification rendered. It is well settled that in a Customs classification case the plaintiff must not only prove that the classification is wrong, the plaintiff must also prove that its claimed classification is correct. *United States* v. *New York Merchandise Co., Inc.*, 58 CCPA 53, C.A.D. 1004, 435 F. 2d 1315 (1970).

Applying this principle to the facts of this case, it is clear that defendant's motion must be granted as a matter of law. First, in the court's opinion, the Powerail and its accessories are no more a "part" of an overhead crane as claimed by plaintiff than a third rail in a subway system is "part" of the train. The Powerail, being wholly external to the crane, is nothing more than an electrical bridge between a stationary power source and an overhead traveling crane which utilizes its power to perform the motions of hoisting, trolley traversing, and bridging, which functions, the court is informed, may well be powered by hand, electricity, air, hydraulics, or a combination of these. See Baumeister & Marks, "Standard Handbook for Mechanical Engineers" (7th ed. 1967), section 10, page 37. Since electric power is not indispensable to the operation of an overhead crane, it follows that by no stretch of the imagination can it properly be said that the Powerail, whose only function is to carry electric power, is a part of the crane. *Cf. Ralph C. Coxhead Corp.* v. *United States*, 22 CCPA 96, T.D. 47080 (1934).

But even if electric power were indispensable to the operation of an overhead crane, the Powerail can only be regarded as being part of a separate entity, namely, the stationary power source, which *supplies* energy to a machine, and not as part of the machine that *receives* the energy. *United States* v. *Janson Co.*, 16 Ct. Cust. Appls. 315,

320, T.D. 43075 (1928). See also *Japan Import Co.* v. *United States*, 72 Treas. Dec. 490, T.D. 49224 (1937). Plaintiff's argument to the contrary simply fails to distinguish between an article whose presence is essential to *completion* of a crane and an article whose presence would be essential to *operation* of a crane. The Powerail, falling in the latter category, would comprise no part of a crane, and the court so holds.

Second, even assuming the Powerail to be "part" of an overhead crane, the question then arising from plaintiff's evidence would be whether such use has been shown to be the *chief use* of the part. And here, too, plaintiff's case must be found wanting as a matter of law.

Although the witness Schneider testified with respect to sales of the imported product in the United States, plaintiff presented no evidence relative to uses of other merchandise of this kind, notwithstanding the fact that the witness virtually conceded the existence of other merchandise of the same class or kind as that imported. Moreover, in its amended complaint [P7] plaintiff admitted that the Powerail was designed for "the utilization of electric current to transport mechanical *devices* along a restrictive path (overhead traveling cranes)" [italic added]—a posture which has been amply corroborated by evidence of a plurality of uses for the imported devices that plaintiff itself placed in the record in the form of a patent (exhibit 3). Thus, in view of the requirements of general interpretative rule 10(e) (i), TSUS,[1] the conclusion is inescapable that plaintiff has failed to establish *prima facie* the chief use of the class or kind of merchandise to which the imported merchandise belongs. See *Hawaiian Motor Company* v. *United States*, 82 Cust. Ct. 70, C.D. 4790, 473 F. Supp. 787, decided March 8, 1979 (*appeal pending*), and *United States* v. *Baltimore & Ohio R.R. Co. a/c United China & Glass Co.*, 47 CCPA 1, C.A.D. 719 (1959).

For the reasons stated, defendant's motion to dismiss is granted, without, however, affirming the classification of the merchandise.

Judgment will be entered herein accordingly.

(C.D. 4829)

---

[1] General interpretative rule 10(e) (i), TSUS, states: "A tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined."