Yamaha International Corp., plaintiff *v.* United States
defendant

Court No. 80–6–00908

Before Landis, *Senior Judge.*

(Decided March 9, 1984)

*Glad & White (Edward N. Glad* at the trial and on the briefs) for the plaintiff.
*Richard K. Willard,* Acting Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*Susan Handler-Manahem* at the trial and on the brief), for the defendant.

LANDIS, *Senior Judge:* This case was tried before me in Los Angeles, California. The District Director for the Port of Los Angeles classified merchandise imported from Japan pursuant to TSUS item 725.47 as an electronic musical instrument and imposed a duty at the rate of 17% *ad valorem.* The District Director considered the merchandise as an unfinished electronic organ. Plaintiff argues that the merchandise in issue consists of various parts of an electronic musical instrument as in its imported form it lacked a cabinet and a bench.

The applicable TSUS items are: General Interpretive Rules

\*       \*       \*       \*       \*       \*       \*

10(h)  Unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished.

10(ij)  a provision for 'parts' of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

*Classified:*

Electronic musical instruments:

Item 725.47    Other............................................ 17% ad valorem

*Claimed:*

\*      \*      \*      \*      \*      \*      \*

\* \* \* inductors; all the foregoing which are electrical goods, and parts thereof:

\*      \*      \*      \*      \*      \*      \*

Item 682.60    Other............................................ 7.5% ad valorem

\*      \*      \*      \*      \*      \*      \*

Item 684.70    Microphones; loudspeakers; 7.5% ad valorem head phones; audio frequency electric amplifiers; electric sound amplifier sets comprised of the foregoing components; and parts of the foregoing articles (including microphone stands).

\*      \*      \*      \*      \*      \*      \*

Item 726.90    Musical instrument parts not 8.5% ad valorem specially provided for.

The issues presented are whether the various imported components constituted an unfinished muscial instrument or are merely individual parts thereof and, whether plaintiff has sustained its dual burden of proof.

At the trial plaintiff called four witnesses and introduced sixteen exhibits. Defendant called one witness and introduced one exhibit.

Plaintiff's first witness was Mr. Yoshi Kobayshi, import manager of Yamaha International Corporation (YIC) for twenty two years.

The record indicates that his duties included classifying all shipments entering this country according to TSUS for subsequent clearance through customs (R.6). The witness testified that he currently brings in various components that are not assessed as unfinished organs such as amplifiers, power supply units, and loudspeakers all of which are assessed under various TSUS items (R.17). In response to counsel for plaintiff's question about the classification of the remaining components for these electronic organs he replied that they would be classified under other parts for the organ pursuant to TSUS 726.90. On cross-examination Mr. Kobayshi testified that the classification of the individual parts (R.17) represented an entirely different situation from the merchandise before the court at this trial (R.18).

Plaintiff's second witness was Mr. William I. Perkins who testified that he was Director of Product Assurance for the Yamaha Corporation. He testified that he has been with the company for thirteen years and that his former position was National Service Manager, Electronic Organ Products (R.20). The testimony indicates that Mr. Perkins has a long history (dating back to approximately 1948) of dealing in electronic components especially related to electronic organs (R.22). Mr. Perkins testified extensively as to the various components that are included in an electronic organ (R.14–35) resulting in Exhibits 4 through 11 inclusive being received in evidence. Mr. Perkins testified that the rack assembly consists of components assembled to the extent that only five (5) percent of all components are capable of being plugged in and that the remainder of the rack assembly has to be hand soldered (R.42). The witness further testified that time studies (efficiency reports) are performed by Yamaha after the production run ends and thereafter shredded. The witness testified that the front part of the organ cabinet acts as a baffle which is necessary to the operation of an electronic organ (R.51). He further stated that it takes eight people working four and one half hours to assemble all of the components into the cabinet. The witness also testified that the organ bench provides the proper height that a performer would expect as organ players have to use their legs to play the pedal keyboard (R.56). The witness also testified that as he knows the term "unfinished" in the industry it refers to an organ in a case that has not had oil or lacquer applied (R.58).

On cross-examination Mr. Perkins testified that a speaker would make noise without a baffle. He further testified on cross-examination that it does not take four and one half hours of work time for each of the eight people to assemble the basic electronic components to the cabinet (R.68, ref. to R.53). The witness also testified that music could be produced on a D–80 model organ and an A–60 model organ even though there was no bench (R.69–70). The witness could not, by self-admission, testify with accuracy as to the

total number of parts contained in the various subassemblies of the imported merchandise (R.73, 74).

Plaintiff's third witness was Mr. Jack Flon who testified that he has been an employee of YIC for eighteen years and is currently Director of Marketing, Keyboard Division for YIC. Mr. Flon testified that he became National Sales Manager for YIC in 1973 and, in holding that position, he was responsible for the sales of organs and pianos throughout the United States (R. 79). As Director of Marketing he testified that he meets with advertising agencies and cabinet designers. Mr. Flon further testified as to his understanding of the term unfinished electronic organs stating that in the trade an unfinished organ denotes an organ is in its white form which means that it has not been stained (R. 87). On cross-examination the witness testified that he obtained his knowledge of the term unfinished organ through his many contacts in the industry over a period of many years (R. 89).

Plaintiff's final witness was Mr. David Lu, the Corporate Accounting Manager for YIC since 1977. Previously, he was the Cost Accountant for YIC. Mr. Lu's testimony was to serve as the foundation for the introduction of Exhibits 20 and 21 which were cost sheets. However, Mr. Lu testified that the costs and burden of labor are standardized for each year and will not change for the fiscal year. The witness testified that the standard costs are derived from an engineering study and not from the cost of actual production (R. 100, 101). The exhibits were held inadmissible by the court and counsel for plaintiff made an offer of proof as to the cost of U.S. materials and burden of labor contained in Exhibits 20 and 21 (R. 108).

Defendant's sole witness was Mr. David A. Bunger, Vice President of Engineering for the Baldwin Piano and Organ Company. Mr. Bunger had been employed for twenty three years by the Baldwin Company. He is responsible for all of the research, design and development for Baldwin electronic organs and is also responsible for the Technical Service Department for the Baldwin Company. Mr. Bunger is a member of the Audio Engineering Society and the American Management Association. The witness testified that he holds over twenty five patents mostly related to electronic circuit design (R. 111). Mr. Bunger testified that he would not consider a loudspeaker a subassembly of the electronic organ but rather, he denominated it as a component thereof. The witness testified that the cabinet allows an electronic organ to be put in saleable form. He further stated that the cabinet acts as a baffle which will allow a better performance of the speaker. Mr. Bunger testified that the speaker makes recognizable music without the aid of the cabinet (R. 118). The witness also testified that the added cost due to ornate cabinet styling would have no effect on the quality of the organ's music production (R. 119). He further testified that if one had all of the working components of an electronic organ but *did not have a*

*cabinet,* these components and subassemblies could be connected in a way that would result in the creation of music (R. 120, 121).[1]

The witness also testified that as a ratio, it typically takes between three or four to one the amount of time to assemble the components and subassemblies as it does to mount these electronic components and subassemblies into the cabinet.

This Court and the United States Court of Customs and Patent Appeals (presently known as the United States Court for the Federal Circuit) have definitively held that parts of an unfinished article are classifiable as the article itself and not as parts of the unfinished article where in its imported condition it is a substantially complete article of the intended nature. *Daisy-Heddon, Div. Victor Comptometer Corp.* v. *United States,* 66 CCPA 97, C.A.D. 1228, 600 F.2d 799 (1979); *General Electric Co.* v. *United States,* 2 CIT 84, 525 F. Supp. 1244 (1981), aff'd., 69 CCPA 166, 681 F.2d 785 (1982). It is clear that these cases have resolved and clarified the competing tariff provisions for unfinished articles (General Interpretive Rule 10(h)) and the various TSUS items pertaining to parts by holding that a substantially complete article is classifiable as an unfinished article despite the omission of an essential part. In *Daisy-Heddon, supra,* the CCPA stated:

> In reading the majority opinion in *Authentic Furniture,* it must be emphasized that the court approved the test applied by the Customs Court and was not attempting to formulate another test or modify the test applied by the Customs Court. [4] However, the language of the majority opinion indicates that a different formulation of the test was in fact adopted. It has since caused some confusion, and, if improperly read, could result in decisions which are at odds with what we perceive to be the intent of Congress as expressed in general interpretative headnote 10(h). To the extent that the majority opinion in *Authentic Furniture* may be so read as providing a test other than the test used in that case by the Customs Court, it is expressly overruled for the reasons set forth below. (At 101, 102).

That court then specifically reasoned:

> [5] If, as appellant argues, the omission of a part essential to the use of the eo nomine designated article would prevent classification as the article in an unfinished condition, there would

---

[1] The following is the pertinent testimony:

Q. Mr. Bunger, if you had all of the working components of an electronic organ but did not have a cabinet, could these components be attached to create music?

A. Yes.

Q. How could that be done?

A. Very simply by making all of the necessary connections of various subassemblies, except that you would not normally have them in their normal playing position. They could sit out on a table top, for example.

Q. And you could still create music from these components?

A. Yes. In fact, this is a normal way, in engineering, that you may work on new features for organs or a new organ system design. Prior to having any cabinet, you are designing the electronics that is going to be producing these various features in the music.

Now, typically, if you have these components sitting on a bench, you may have some speaker cabinet that you would be playing the music through. That is not necessary. You could have a speaker laying on the bench. You could recognize it as music but would not be able to judge its true value.

be, in practical effect, no such thing as an unfinished article, since the omission of virtually any part from an otherwise complete article would prevent its use in the manner intended. See *Authentic Furniture Products,* 61 CCPA at 8, 486 F.2d at 1064–65 (Miller, J., dissenting). Such is clearly not the intent of Congress, as evidenced by the very existence of General Interpretative Rule 10(h).

To assist in determining whether an article is substantially complete the CCPA in *Daisy-Heddon,* id., set forth five factors (although not exhaustive) for consideration. These relevant factors include:

> * * * The following factors can be relevant: (1) Comparison of the number of omitted parts with the number of included parts; (2) comparison of the time and effort required to complete the article with the time and effort required to place it in its imported condition; (3) comparison of the cost of the included parts with that of the omitted parts; (4) the significance of the omitted parts to the overall functioning of the completed article; and, (5) trade customs, i.e., does the trade recognize the importation as an unfinished article or as merely a part of that article. This list of factors is not exhaustive; it must be recognized that fewer than all of the above factors, or additional factors, may come into play depending on the particular importation * * *.

In view of this discussion plaintiff's reliance upon *Montgomery Ward & Co.* v. *United States,* 61 CCPA 101, C.A.D. 1131, 499 F. 2d 1283 (1974) is unjustified, and the court will now review the evidence of record against the backdrop of the guidelines enunciated in *Daisy-Heddon.*

Initially, the court will discuss plaintiff's attempted inclusion of the organ bench during the trial. While the court did permit testimony relative to a bench to be introduced into evidence it did not by implication grant an amendment of the complaint. The bench was not pleaded in the complaint nor was there a formal motion whether written or oral to amend the complaint. A party is generally bound by its pleadings. *Ataka America, Inc.* v. *United States,* 80 Cust. Ct. 132, C.D. 4745 (1978). Matters not covered by the pleadings but discussed in the brief, are generally not properly before the court. *Border Brokerage Co.* v. *United States,* 83 Cust. Ct. 97, C.D. 4825, 484 F. Supp. 901 (1979), aff'd. 68 CCPA 32, C.A.D. 1254, 646 F. 2d 539 (1981).

In any event the organ bench is not essential to produce music from the organ. The testimony of plaintiff's witness, Mr. Perkins, on cross-examination indicates a bench is not essential to producing music from the organ and that a chair or stool of the proper height would enable the player to produce music (R. 70). Defendant's witness, Mr. Bunger, testified on cross-examination that a bench is not necessary to play the organ in issue (R. 134), but that to fully operate the organ a bench would be desirable (R. 135).

The bench has no part in the production of electronic sound. Indeed, it is not physically attached nor is it an integrated component or even a part of the organ unit. *United States* v. *Willoughby Camera Stores, Inc.,* 21 CCPA 323, T.D. 46851 (1933), cert. den. 292 U.S. 640 (1933). See also, *United States* v. *American Steel and Copper Plate Co.,* 14 Ct. Cust. Appls. 139, T.D. 41673 (1926), where the court held that no article can be held to be a part of another article if it is not essential to the use of the other.

In evaluating the evidence in light of the first test under *Daisy-Heddon, supra,* it is clear that the exhibits speak for themselves. The only part added after importation was a cabinet. The essence of an electronic instrument is the electronic development of sound. Indeed, TSUS is clear on this point. Schedule 7, Part 3, Subpart A, Headnote 2(c) states:

> (c) the term *'electronic musical instruments'* embraces all musical instruments in which the sound is generated electrically, and conventional-type instruments not suitable for playing without electrical amplification, but the term does not include conventional-type instruments, fitted with electrical pickup and amplifying devices, when the instrument is suitable for playing without such amplification.

The complexity and basic number of components incorporated into the various subassemblies far overweigh the number of the singular additional standard part, the cabinet.

Plaintiff has also failed to demonstrate that the time and effort in placing the article in its final condition approaches the time and effort involved in the manufacturing of the imported article. Plaintiff, who bears the burden of proof, did not submit specific monetary figures addressing this issue. Plaintiff introduced evidence only to the effect that it required eight men an average of four and one half hours to complete the cabinet assemblage (R. 53). However, all the man were not working at the same time, therefore, the total man-hours would reflect a figure less than thirty six hours required for assemblage (R. 68).

The third test included under the *Daisy-Heddon* guidelines is a comparison between the cost of included parts and omitted parts. Here, the entire electronic system that enables the generation of sound, the electronic subassemblies and the numerous components thereof, should be compared with the cost of the organ housing. Plaintiff, however, fails to affirmatively show cost data. Mr. David Lu, plaintiff's accounting manager and former cost accountant testified that the costs and burden of labor are standardized for an annual fiscal period and that such costs are not the actual cost of production, but rather are derived from an engineering study (R. 100, 101). Based upon this testimony the court, at trial, denied the admission of two exhibits relating to production costs.

The fourth guideline enunciated under *Daisy-Heddon* is the significance of the omitted parts as opposed to the overall functioning

of the completed article. For marketing purposes the electronic organs in issue must have a cabinet. However, it must be reiterated that it is the electronic components that create the sound and, therefore, are the basic essence of the electronic organ. Congress was distinct in its classification of electronic instruments. It is the electronic components that cause the resultant sound. The cabinets or any other housing for the refinement of sound are not at issue. It is the basic creation of the sound electronically that the statute addresses (Schedule 7, Part 3, Subpart A, Headnote 2(c) *supra*. Defendant's witness, Mr. Bunger, specifically testified that the speaker will make recognizable music without a cabinet (R. 118). Mr. Bunger further testified that in the "normal way" an engineer would place the electronic subassemblies on table tops and that speakers could be placed on benches rather than in cabinets (R. 121). In response to the question whether the electronic components of the organ without the cabinet would constitute a substantially complete functioning organ, the answer was in the affirmative (R. 124). Mr. Bunger further testified on recross-examination that he has known of an organist who can play the organ without benefit of a bench (R. 150). Mr. Bunger's testimony appeared to be well-founded and more reliable than plaintiff's witnesses Kobayshi or Perkins.

The final test set forth by the CCPA in the *Daisy-Heddon* decision is whether the trade recognizes the importation as an unfinished article or as merely a part of that article. Addressing this issue plaintiff's witnesses, Perkins and Flon, testified that an unfinished organ is one that is housed in a cabinet that has not been stained, oiled or lacquered (R. 58, 87). Defendant's witness, Bunger, testified that if all of the components of an electronic organ were present but did not have a cabinet in which to be stored he would consider it a substantially complete, functioning organ (R. 124). When asked whether the electronic organ trade would otherwise consider the imported product a substantially complete, functioning organ the witness responded that he did not know what they would consider a substantially complete, functioning organ (R. 124). It appears that plaintiff's submission of proof on this issue is geared toward the sales and marketing phase while defendant's touches entirely upon the technical theory of an unfinished electronic organ. Once again it must be emphasized that it is the combination of the electronic components and subassemblies that accomplish the basic purpose of the imported merchandise, namely, to produce music through electronic impulses. Since it is a question of an unfinished electronic instrument versus components thereof in addition to the fact that the imported merchandise was sold as individual sets, it appears that Mr. Bunger's testimony should be afforded greater weight than that of Messrs. Perkins and Flon.

Plaintiff has failed to meet its dual burden of proving the Customs Service classification is in error and its own claimed classifi-

cation is correct. *United States* v. *New York Merchandise,* 58 CCPA 53, C.A.D. 1004, 435 F.2d 1315 (1970); *Hawaiian Motor Co.* v. *United States,* 82 Cust Ct. 70, C.D. 4790, 473 F. Supp. 787 (1979), aff'd., 67 CCPA 42, C.A.D. 1241, 617 F.2d 286 (1980); *Merry Mary Fabrics, Inc.* v. *United States,* 1 CIT 13 (1980). The record clearly indicates that there is substantial and weighty evidence to sustain the District Director's determination. Further, the merchandise was imported as a complete set for use as an electronic organ. There is no evidence that any further electrical components were necessary for the production of music. The merchandise is essentially an integrated unit.

Accordingly the classification of the District Director of Customs at the port of Los Angeles is sustained and the complaint is, in all respects, dismissed.